ALFRED E. MEAD AND RACHEL E. MEAD

v.

EDWARD STEVENS.

*Mortgages—Foreclosure — Substituted Collateral Security—Agency—
Credit for Payments of Taxes and Expenses.*

Upon a bill of foreclosure, it is *held:* That the evidence shows that on
the surrender by the mortgagee of certain notes and a mortgage securing
them, held by him as collateral security, he accepted a conveyance of the
premises covered by said surrendered mortgage as a substituted collateral
and not as payment of his debt; that the agent who made said arrange-
ment acted as agent of both parties; and that the complainant is entitled to

credit for the amount paid as taxes on said premises and for the amount paid the agent for services and expenses.

[Opinion filed January 22, 1887.]

Appeal from the Circuit Court of Mercer County; the Hon. John J. Glenn, Judge, presiding.

Statement by Welch, J.   On the 19th day of June, 1882, Alfred E. Mead, one of the appellants, negotiated a loan through L. D. Holmes, from the appellee, for the sum of $2,500, and executed to appellee his promissory note therefor, payable two years after the date thereof with interest thereon at the rate of 8 per cent. per annum.   To secure the payment of said note the appellants executed a mortgage upon lot 3 in block 9 in the city of New Boston, and as a further security Alfred E. Mead assigned to the appellee two notes on Silas Tipton and Francis F. Tipton, together with other notes.   The Tipton notes were executed on the 19th day of May, 1881; one for the sum of $600, payable four years after date; the other for the sum of $1,000, payable five years after date, each of said notes bearing interest at the rate of 8 per cent. per annum, payable annually.   Silas Tipton and Aboline Tipton, his wife, and Francis F. Tipton, executed a mortgage on the southeast quarter of section 31, township 3 south, range 4, west of the 4th principal meridian, Pike County, Illinois, to secure the payment of said note.   It was provided in said mortgage "that in case of default in the payment of the interest thereon at the time specified, or the non-payment of taxes, etc., then and in such case the whole of said principal sum and interest secured by the said notes shall, at the option of the holder or his assigns, become immediately due and payable."

On the 17th day of May, 1883, Francis F. Tipton deeded his interest in said land to Silas Tipton, and on September 18, 1883, Silas Tipton and Aboline, his wife, conveyed said land by quit-claim deed to the appellee, the consideration for said conveyance being the surrender to Tipton of his two notes and mortgage executed to Mead, and by Mead assigned

to the appellee as collateral security for his note to him.
Appellee filed his bill in chancery to the March term, 1885,
of the Mercer County Circuit Court, to foreclose the mort-
gage executed to him by the appellants on lot 3 in block 9 in
the city of New Boston. He also filed his bill in chancery to
the November term of the Pike County Circuit Court against
the appellants for the purpose of foreclosing on the deed exe-
cuted to him by Tipton and wife, charging in said bill "that
said conveyance was made by the consent of said Mead to him
as a mortgage, and that it is so held by him to secure the note
aforesaid of said Mead to him, and is subject, however, to a
condition of defeasance upon the payment of the principal
sum and interest on the note aforesaid, according to the tenor
and effect of said promissory note." The venue in this suit
was by consent changed to Mercer County, and was by an
order of the Mercer County Circuit Court consolidated with
the other suit of appellee against the appellants. The ap-
pellants filed their answer. They deny that they ever con-
sented to the taking of the deed from Tipton and wife by the
appellee, and the surrender by him of the Tipton notes and
mortgage to Tipton; they deny that they have ratified said
act since it was done. They insist that the amount of the
Tipton notes, principal and interest thereon, due at the time of
their surrender to Tipton by the appellee, should be credited
upon the note of Mead to the appellee; they ask that an
account be taken of all money collected by the appellee upon
the collaterals placed in his hands by Mead, and claim that
upon such accounting it will be found that there is nothing
due the appellee upon the note of Mead to him; replication
filed; cause referred to master to take proof, state the account,
and report to the court his findings.

On the 16th day of October, 1885, the master filed his
report, showing a balance due the appellee upon his note and
mortgage of the sum of $1,835.24. Exceptions were filed to
said report which were overruled by the master, and the
action of the master in overruling the exceptions was sustained
by the court. Decree in favor of the appellee for the sum of
$1,856.24 and costs of suit, including a solicitor's fee of $50,
from which decree this appeal is taken.

Mead v. Stevens.

Messrs. B. C. Taliaferro and James H. Connell, for appellants.

Taking of possession, paying taxes and disposing of the rents of the place, negative the idea that the deed was intended as a mortgage. And a deed absolute upon its face will never be held to be a mortgage unless the proof is clear and positive that it was so intended by the parties to the deed at the time of its execution. Workman v. Green, Legal News, February 6, 1886.

A party, alleging that a deed is a mortgage only, is required to make strict proof of the fact. Smith v. Cremer, 71 Ill. 185.

The kind of parol evidence to show an absolute deed to be a mortgage is that of facts and circumstances of such a nature as to control the operation of the deed, and not loose declarations of parties touching the intention or understanding. Lindaur v. Cummings, 57 Ill. 195; Sutphen v. Cushman, 35 Ill. 186.

It must be clearly shown that a deed absolute on its face was intended to be a mortgage by the parties at the time of its execution. Sharp v. Smitherman, 85 Ill. 153; Remington v. Campbell, 60 Ill. 516.

Slight indefinite statements are not sufficient to make a deed a mortgage. Dwen v. Blake, 44 Ill. 135; Low v. Graff, 80 Ill. 360.

A deed can only operate as a mortgage if it appeared to be the intention of the parties that it should be at the time of its execution. Shays v. Norton, 48 Ill. 100; Bentley v. O'Bryan, 111. Ill. 53; Frizell v. Cole, 29 Ill. 465; Straubher v. Moh'er, 80 Ill. 21; Hartley v. Lyburger, 3 Ill. App. 554.

A purchase of the mortgaged property by the mortgagee is a payment of the debt. Massey v. Harden, 81 Ill. 330; Bodley v. Anderson, 2 Ill. App. 450.

Absolute deed upon its face intended as a mortgage is so both under common law and statute as between the parties, and those who have notice, and not to others. Bullock v. Battenhausen, 108 Ill. 28.

In this case Mead was not a party to the deed, but the evidence shows that at the time the deed was made by Tipton

to Stevens that the Meads knew nothing about it, and were not parties to the deed and had nothing to do with it. Hancock v. Harper, 86 Ill. 445.

A deed conveying absolute in form and contemporaneous with an agreement to re-convey, held, not to be a mortgage. Rue v. Dole, 107 Ill. 275; Carpenter v. Carpenter, 70 Ill. 457; Maxfield v. Patchen, 29 Ill. 39.

The pledgee of commercial paper, bonds, mortgages, or promissory notes, held as collateral security for the payment of a debt, is bound to collect the same as they become due, and apply the net proceeds to the payment of the debt. Joliet Iron Co. v. Scioto Fire Brick Co., 82 Ill. 548; Union Trust Co. v. Rigdon, 93 Ill. 458.

Parties holding collaterals are bound to account for the full value. Union Trust Co. v. Rigdon, 93 Ill. 458, 468; Loomis v. Stave, 72 Ill. 623; Aldrich v. Goodell, 75 Ill. 452; Jenkins v. International Bank, 111 Ill. 462; Wheeler v. Newbould, 16 N. Y. 392.

The pledgee of commercial paper, in the absence of any power of sale by contract, can not sell such paper, but it is his duty to collect the same and apply enough of the proceeds to pay his debt and return the balance to the pledgor. Zimpleman v. Veeder, 98 Ill. 613.

The pledgee must account for the value of the pledge, as he purchased the land on his own account and gave up Mead's securities without his consent. Massey v. Hardin, 81 Ill. 330; Bordley v. Anderson, 2 Ill. App. 450.

Messrs. BASSETT & WHARTON, for appellee.

WELCH, J. The principal contention in this case arises upon the disposition made of the Tipton notes and mortgage assigned to the appellee by the appellant Alfred E. Mead, as collateral security for his note of $2,500 · to the appellee. It is insisted by the solicitor for the appellants that the "pledgee of commercial paper, bonds, mortgages, or promissory notes held as collateral security for the payment of a debt, is bound to collect the same as they become due, and apply the net pro-

Mead v. Stevens.

ceeds to the payment of the debt." "Parties holding collaterals are bound to account for the full value." Cole v. Dalziel, 13 Ill. App. 23; Union Trust Co. v. Rigdon, 93 Ill. 458, 468; Jenkins et al. v. International Bank, 111 Ill. 462. Under the rule announced *supra*, it is claimed that the appellee should account to Mead for the full amount of the principal and interest due on the Tipton notes at the time that the appellee took from Tipton the quitclaim deed, and surrendered to him his notes and mortgage. It is conceded by the solicitor for the appellee, that if the appellee had taken the deed and surrendered up to Tipton his notes and mortgage without authority or consent of Mead, appellee would be bound to account to Mead for the amount due on said notes at the time of their surrender to Tipton. The master in chancery, in his report, finds: "That the said Silas Tipton and Francis F. Tipton having failed to pay the notes so secured or the interest thereon, that by a subsequent arrangement between the complainant, appellee and defendants, Alfred E. Mead and Rachel E. Mead, appellants, the notes were surrendered to the said Tiptons, and they conveyed the said real estate in Pike County to the complainant (appellee) by absolute deed, which was held by said Stevens as security only, for the note of A. E. Mead." The finding of the master was approved by the court. It is insisted by the solicitor for the appellants that the evidence does not sustain this finding. Lewis D. Holmes, who acted as the agent and attorney for the appellant Alfred E. Mead in negotiating and procuring the loan from the appellee of the $2,500, states in answer to the question "whether he had anything to do in and about the collection of notes against Silas Tipton for either the complainant (appellee) or Alfred E. Mead," "I did; acted as the attorney for both Stevens and Mead. About the 17th of May, 1883, the notes and mortgage against Silas Tipton held by Edward Stevens as collateral security were due; by the directions of Mr. Stevens and I think, Mr. Mead, I went to Baylis and saw Mr. Tipton. The amount due on the notes and mortgage was about the same as the value of the land conveyed by the mortgage. I had discussed this question with both Mead and

Stevens, and to save the expense and delay of a foreclosure in chancery, I secured from Mr. Tipton a contract. By said contract said Tipton, in consideration of the extension of time in the paying the interest upon his two notes until October 1st, agreed to execute a deed with his wife to Edward Stevens to the land described in his mortgage to Mead, within thirty days, and deliver the same to George W. Hooper in escrow. Said deed to be delivered by Hooper on the 1st day of October, if the interest was not paid, and if paid the deed was to be destroyed. If the deed was delivered to Stevens he was to deliver to Tipton his two notes and mortgage executed to Mead, and assigned to Stevens as collateral security. The contract was signed by Tipton and by Stevens per Holmes, the attorney for Stevens."

Holmes, after making the contract, states: " I returned home and saw Mr. Mead and Stevens both and told them what I had done; they both assented and agreed to the contract I had made. About November the 10th, in the same year, at the request of Mr. Stevens and I think, Mr. Mead, I went to Pittsfield and examined the records to see if there were any judgments against Tipton, and returned to Baylis from Pittsfield; and while in Baylis received quit-claim deed from Silas Tipton and his wife to Edward Stevens, conveying all their interest in the land described in their mortgage to Mead. At the same time I surrendered to Tipton his notes and mortgage, which Mr. Stevens had held. I then returned home and saw Mr. Mead and Mr. Stevens and told them what I had done, and said to them that the only title Mr. Stevens would have in the land, was to hold it as security for payment of Mead's debt to him, to which they both agreed. While at Baylis I secured a man, Albert C. Bently, to take charge of the farm for Stevens and try to sell it." He also states that he informed Rachel E. Mead of the facts in the case, and said to her that as soon as the debt from Mr. Mead to Mr. Stevens was paid off, that he was to quit-claim, convey or release to her all his interest in the land; she expressed herself as very much pleased, and said they hoped to pay off the mortgage and save that piece of land to her, Mr. Mead having conveyed it to her before that conversation.

Stevens states, " Holmes gave up the notes and mortgage as my attorney. ·He was the only person I had anything to do with that I know of; Holmes did the business for me, and he thought that was the best way. I was to hold the land as collateral. I supposed the land belonged to Mead. It was my understanding. I did not buy the notes of Mead. I supposed the land belonged to Mead after I got the deed from Tipton because I had never paid anything for the land· * * * I had a conversation with Mead about ten months afterward, as near as I can remember. All that was said was that the land had been deeded to me by Tipton. There was nothing said about mortgage. I and Mead had but little talk about it. I did not make a statement to him why and how it came to be deeded to me and how I held it."

Mead denies that he ever employed Holmes as his agent or attorney to collect the notes that he transferred to Stevens as collateral, and denies that he directed him to do anything toward fixing up the Tipton matter, and says: " I do not remember that I ever agreed with Holmes or Stevens, after Holmes returned from Pike county, that Stevens should hold the Tipton land by deed as security for what I owed Stevens." He denies that he authorized Holmes to make the written contract referred to *supra*, and denies that he ever ratified said contract in any conversation with Holmes ; denies that he ever agreed to pay any of the expenses of Holmes, and denies that he ever expressed himself satisfied with the deeding of the Tipton land to Stevens after it was done. He says : " I supposed he, Holmes, had taken the land in trust for Stevens." Mrs. Mead admits that she had a conversation with Holmes in regard to the Pike County land and the conveyance of it to Stevens, as stated by Holmes, except she denies that she expressed herself as satisfied with it.

At the time of the conveyance to Stevens·by Tipton, and the delivery to him of his notes and mortgage, there was due on the notes, principal and interest, the sum of $1,902.56. The master's statement shows on that date, without giving any credit for the Tipton notes, that there was due Stevens on Mead's note to him $1,745.07, after charging Mead with

all taxes and expenses for collection. If Stevens is to be
charged with the Tipton notes he was at that time overpaid
the sum of $156.89; yet we find that after that, on February
25, 1885, he collected on the note of Mr. Neff the sum of
$121, making the over-payment to him, if he is to be
charged with the Tipton notes, the sum of $277.89.

Mead states that "just before or after the bill was filed in
this case he applied to Stevens to know what amount was due
him on his note to him, and that Stevens claimed that there
was due him some $1,600 or $1,700, and that at that time
Stevens presented a statement and account and that he looked
over it, and that there was no credit given for the Tipton
notes."

He also states in response to the question "Did not you
about or near that time make an arrangement with Willard
Signor, of New Boston, to sell him a part of the New Boston
property included in the mortgage for $750, and ask Mr.
Stevens to take the $750 and release the mortgage on that
property and credit the $750 on your note in controversy?"
"I think I did." He further states in response to the ques-
tion "Did you not afterward a short time, or about the
same time, propose, in addition to the arrangement to sell Mr.
Signor, to sell Mr. Stevens the balance of the New Boston
property included in the mortgage for a sufficient sum, in all
to make $1,400, and have the same credited on the note in
controversy that Mr. Stevens holds against you?" "There
was an arrangement whereby Mr. Stevens was to deed the
Pike County land to my wife, and we were to make him a deed
to the New Boston property, and Signor was to take the brick
house and pay $750 or $800. I think it was $800." In this
arrangement he says, "there was nothing said about selling or
buying the Pike County land between us." The account fur-
nished by Stevens also included the amount paid by him for
taxes, and the amount paid to Holmes for his two trips to
Pike County. Mead says in relation to that, that he did not
know he made two trips; he thought he only made one.

On September 2, 1884, Mrs. Mead writes to Mr. Bently, in
whose charge the land in Pike County had been left by Mr.

Holmes, in regard to the leasing of this farm by Mr. Tipton, giving specific directions as to the terms on which he could rent it, and the manner the fences and timber were to be taken care of. On November 1, 1884, Mr. A. E. Mead writes to Mr. Bently "to know whether the wheat has been threshed, and if so, to send the amount due us, and to let us know if the place could be sold, and what he thought a fair price for it." On December 27, 1884, he wrote again to Bently, in which he says:

"I wrote you a letter some time ago in regard to the wheat raised on the place Tipton rented; would like to know how much wheat was raised and if our share has been delivered yet; if not, please let me know at once ; also have the corn sold and pay taxes out of the money received for corn. Please send the money to my wife, R. E. Mead, that you receive on wheat sold, less your trouble. Please let me hear from you as soon as possible." We have carefully examined the evidence, and in our opinion the finding of the master in chancery as to the Tipton notes and mortgage is sustained by the evidence. In our opinion the evidence shows that Holmes, in the arrangement that he made with Tipton to surrender up the notes and mortgage and in taking the deed to Stevens, was acting as the agent of Mead and Stevens, and that it was understood and agreed between them that Stevens should hold the Pike County land in trust and as a substituted collateral for the Tipton notes and mortgage. The subsequent conduct of Mead, as shown by the evidence, can only be reconciled upon this theory. If the claim now asserted by him, that the Tipton notes were surrendered and the deed taken by Stevens without his consent, why was it that he was undertaking to negotiate the sale of the New Boston property to pay to Stevens a balance claimed to be due on his note to Stevens?

If his claim was valid, he had then overpaid Stevens on his note $156.89. Why did he write the letters of November 1, 1884, and of December 27, 1884, *supra*, to Bently, if he claimed to have no interest in the Pike County land ? Why did Mrs. Mead write the letter of September 2, 1884, *supra*, if

she claimed to have no interest in the land? The conduct of Mead and Mrs. Mead fully sustains the evidence of Holmes in relation to the matter, that the surrender of the notes to Tipton and deed to Stevens was intended as a substituted collateral, and was assented and agreed to by them. Stevens, thus holding the title as security for his debt, had the right to pay the taxes, and there was no error in allowing him credit therefor. And we think that the money paid to Holmes by Stevens also was a proper credit; he was acting for Mead and in his interest.

The evidence shows that the Tiptons were insolvent. One of them, Francis Tipton, had left the State. The land was poor and not good security for the debt. The delay in obtaining the possession of the land and expense incident to a foreclosure suit were sufficient inducements for the sending of Holmes to see Tipton and to make the arrangement that was made. By this arrangement the possession of the land was at once obtained, and the cost incident to a foreclosure avoided, provided Mead paid his debt to Stevens. Upon a careful consideration of this case we find no error in the decree.

*Decree affirmed.*