# THE UNION TRUST COMPANY

*v.*

# CHARLES W. RIGDON.

1. PLEDGE—*what interest passes.* On a pledge or pawn of personalty, the legal property does not pass as in the case of a mortgage with a condition of defeasance, but the general ownership remains with the pledgor, and only a special property passes to the pledgee.

2. Where there is no agreement otherwise, a pledgee in possession takes only a lien on the property as a security, and is bound to keep the pledge and not use it to its detriment, and to redeliver it on payment of the debt. His character is that of a trustee for the pledgor, to return the property if redeemed, and if not redeemed then first to pay the debt, and second to pay over the surplus, and he can not so deal with the trust property as to destroy or even impair its value.

3. SAME—*right of pledgee to sell.* Where there is no special agreement, and where the subject of the pawn consists of ordinary goods and chattels, then they may be sold and the proceeds applied to the payment of the debt, and this sale may be either a judicial sale, or in most cases without judicial process, the legal requirements as to notice and the provisions of the law to secure fair dealing being duly regarded.

4. There is a distinction between a pledge of ordinary chattels and a pledge of commercial paper. A pledge of the latter as collateral security for the payment of a debt, does not, in the absence of a special power for that purpose, authorize the pledgee to sell the securities so pledged, upon default of payment, either at public or private sale. He is bound to hold and collect the same as they become due, and apply the net proceeds to the payment of the debt so secured.

5. SAME—*right of pledgee to compromise.* The person holding commercial paper as collateral security for a debt due him, has no right, unless perhaps in a very extreme case, to compromise with the parties to the security for a less sum than is due on the security, and if he does he will be compelled to account to the pledgor for the full value.

6. SAME—*right to dispose of paper to maker under power of sale.* The transfer of promissory notes indorsed as collateral security to secure the payment of a debt of the pledgor, with express written authority to the pledgee to sell the same, or any part thereof, at public or private sale, does not authorize the pledgee to surrender the collaterals to the maker thereof after their maturity without any effort to collect the same, for a sum less than is due thereon, but for enough to pay the principal debt. Such a transaction is not a sale as contemplated by the parties to the pledge, but is a compromise, and renders the

pledgee liable, in an action on the case, to the pledgor for the injury the latter thereby sustains, and if the pledgee at the same time sells other collaterals to the same debtor, the whole transaction being a tort, the pledgee may recover for the whole.

7. SAME—*pledgee surrendering notes pledged may show maker had a good defence.* In a suit by the pledgor of notes against the pledgee to recover damages for surrendering the notes to the maker thereof for less than half their face, the defendant may show that the notes so surrendered were mere accommodation paper and given for no value, or that there was a legal defence to the notes or either of them. But the law will presume, in the absence of proof, that such notes were given upon a good and valuable consideration, and the amount due on them, less the debt they were given to secure, is *prima facie* the measure of damages.

8. In such an action it is not competent for the defendant to show that the pledgor was, at the time of the pledge and afterwards, indebted to the maker of the notes pledged, in a sum greatly in excess of what was due on such notes at the time of their surrender, the defendant having no such interest in the debt due from the pledgor to the maker of the notes as to authorize him to set them off in a suit against him for tort in wrongfully disposing of the pledge.

9. So, in such action, the defendant can not be allowed to prove in defence, that the maker of the pledged notes was in the habit of giving his paper to the pledgor as an accommodation without an offer to prove that the notes so surrendered, or some of them, were given as accommodation paper.

10. REMEDY—*election to proceed against one of two persons.* Where a pledgee of commercial paper, in violation of his trust, surrendered the same to the maker for a sum greatly less than was due thereon, it was held that even if such surrender would not deprive the pledgor of his remedy against the maker as to the balance of the notes not paid by him, the pledgor, having two remedies, had a right to elect which to pursue.

11. CONSIDERATION—*one promissory note for another.* The giving of a promissory note by one person to another is a sufficient consideration to uphold a similar note from that other person to him.

APPEAL from the Appellate Court of the First District; the Hon. THEODORE D. MURPHY, presiding Justice, and Hon. GEO. W. PLEASANTS and Hon. JOSEPH M. BAILEY, Justices.

This action was case *ex delicto.* Appellee recovered judgment in the circuit court of Cook county, against appellant, for $1558, and that judgment was affirmed, on appeal, in the Appellate Court of the First District. Thereupon this appeal was prosecuted.

The following are, in substance, the findings of fact as certified by the Appellate Court:

On the 17th day of August, 1875, Charles W. Rigdon, appellee, procured a discount of the Union Trust Company, a banking corporation, appellant, for $2000, and gave his note of that date for that amount at thirty days. He deposited with appellant, as collateral security, the note of John Miller, dated August 16, 1875, for $2000, payable to the order of Rigdon ninety days after date, and by him, said Rigdon, indorsed. September 18, 1875, said principal note was renewed, and appellee gave the same John Miller note for $2000 and other notes as collaterals. When said second principal note became due appellee procured another extension, and gave his note for $2000, dated October 17, 1875, and gave the aforesaid Miller note of $2000 and other notes as collaterals. When the last mentioned principal note of appellee became due it was not paid, and a further renewal was given. Thereupon appellee executed the following note.

"$2000.            *Chicago, December* 6, 1875.

Forty-five days after date, I promise to pay to the order of the Union Trust Company, at the office of the Union Trust Company's bank, Chicago, Illinois, $2000, for value received, with interest at the rate of ten per cent per annum after due, having deposited with said Union Trust Company, as collateral security, two notes of John Miller for $1000 each, dated May 1, 1874, due in two years; one note of John Miller dated August 16, 1875, for $2000, due in ninety days; two notes of C. W. Rigdon for $200 each, dated December 1, 1874, due in two years; seventeen notes of Willis P. Dickinson, dated December 1, 1874, for $137.50 each, due in three years. And I hereby give the said Union Trust Company, its assign or assigns, authority to sell the same or any part thereof on the maturity of this note, or at any time thereafter, or before, in the event of such securities depreciating in value, at public or private sale, without advertising the same or demanding payment or giving notice, and to apply so much of the pro-

ceeds thereof to the payment of this note as may be necessary to pay the same with all interest due thereon, and also to the payment of all expenses attending the sale of said collaterals, and in case the proceeds of the sale of the said collaterals shall not cover the principal, interest and expenses, I promise to pay any deficiency forthwith after such sale.

C. W. RIGDON. [Seal.]"

With said note was a power of attorney authorizing a confession of judgment in term time or in vacation, and at any time before or after maturity, and the filing of a cognovit, with an agreement therein that no writ of error or appeal should be prosecuted upon the judgment, nor any bill in equity filed to interfere in any manner with the operation of the said judgment, and waiving all errors.

The same John Miller note for $2000, then past due, and the other collaterals specified in said principal note of December 6, 1875, duly indorsed, were deposited with appellant.

The last described principal note fell due January 23, 1876, and was not paid. Four days before its maturity appellee paid $200 thereon and appellant delivered up to appellee his two notes of $200 each, leaving due and unpaid on said principal note, at maturity, the sum of $1800. On the 7th day of February, 1876, appellee paid $500 thereon, and took up one of the John Miller notes for $1000. The two $1000 Miller notes were secured by certain lots, which had before that time been sold to one Walker, in Kentucky, who assumed to pay said notes, and suit on said assumption was pending at Newport at the time of this trial.

February 6, 1876, appellant communicated with appellee, calling upon him to pay his note.

May 4, 1876, appellee wrote to the president of appellant company as follows: "Will you please call and see Mr. D. H. Hale, corner Randolph and Dearborn streets, Bryant block, and tell him the agreement we made, to-wit: Mr. Hale to pay $694, and you to let him have W. P. Dickinson's notes, which

amount to about $2400? It is impossible for me to give the matter my personal attention, therefore ask you." .

Appellant, pursuant to request of said letter, called upon said Hale, and Hale refused to buy the Dickinson notes, and said he would not give five cents on the dollar for them. Appellant made reasonable efforts to sell said collaterals, and failed to find a purchaser.

On the 3d day of May, 1876, appellant wrote to Miller as follows: "We hold Mr. Rigdon's note, due January 23, 1876, on which there remains due some $1300. We hold as collateral the following notes: Seventeen notes of W. P. Dickinson, each for the sum of $137.50; also your note of $2000, and another note of yours for $1000, secured on some property on Blue Island avenue. I regret exceedingly to trouble you in this matter, but as I am obliged to sell the securities I thought perhaps you would prefer to have the first chance to purchase."

Said collaterals were afterwards put into the hands of a Mr. Watson, a partner of Mr. Miller, to see if he could get any one to purchase them, and they were returned to appellant by said Watson with a statement he had not been able to effect a sale.

On the 9th day of May, 1876 the remainder of said collaterals, to-wit: one of said John Miller notes for $1000, and the John Miller note for $2000, and the seventeen Dickinson notes, were sold, surrendered and delivered to said John Miller by appellant for $1342.72, which was the amount then due from appellee on his said principal note of $2000. Said sale and transfer to said Miller was so made without any collusion or actual fraud, and for the best price that appellant could obtain for them, so far as is shown by the evidence.

One of the findings of fact by the Appellate Court, as also an extract from the record of the circuit court ordered to be certified, and the instructions given, refused and modified, are all here omitted, they sufficiently appearing in the opinion of the court.

Messrs. SAWIN & JONES, for the appellant:

1. The power of sale given in this case was without any restriction or limitation that, on a default being made in the payment of the principal note, a sale of the collaterals at private sale would be good. Authorities in support of the proposition that such a power is not good in law, can not be ·found. We must examine beyond the power itself to find matter to impeach the sale.

2. Was the power unlawfully or even improperly exercised? ·The court below certifies its finding, from the evidence, that appellant made reasonable efforts to sell; that Hale, who appellee said would give for the Dickinson notes $694, would not give five cents on the dollar for them; that after this the collaterals were placed upon the market, and no sale could be made; that the sale subsequently made was without collusion or fraud, and that the price sold for was the best that could be obtained. The only case where the exercise of such a power has been questioned is *Sparhawk* v. *Drexel,* 12 Bank Reg. 450–470. · The following cases were cited as governing, in absence of special power: *Garlick* v. *James,* 12 Johns. 149; *Depuy* v. *Clark,* 12 Ind. 427; *Joliet Co.* v. *Scioto Co.* 82 Ill. 548; *Cartelyon* v. *Lansing,* 2 Caines, 200.

3. If Miller bought his own notes for less than their face, does that deprive appellee of his right to recover the balance of Miller?

4. Had the appellant the right to sell the collaterals to Miller? The object of the power was to give appellant the right to convert the collaterals into money and to realize the most that could be obtained at the time of sale. There being no fraud or collusion, and Miller having paid all that could be had for them, the sale ought not to be held void or invalid. There are many instances in which a party may buy his own note, as in the case of a bankrupt. The power given is equal to any judicial decree, and if under the one Miller might purchase he could under the other. *Loomis et al.* v. *Stave,* 72 Ill. 624.

Mr. FRANK BAKER, for the appellee:

1. The power to *sell* the collaterals did not include the power to compromise with the maker of the notes held by the bank as collateral security.

2. Case is the proper form of action where collaterals are fraudulently or improperly sold, and any conduct on the part of the holder of such collaterals, not necessary for his protection, which unlawfully deprives the real owner of his property, is deemed fraudulent within the scope of this remedy. *Stevens* v. *Hurlbut Bank,* 31 Conn. 147; *Garlick* v. *James,* 12 Johns. 149; Dunlap's Paley on Agency, 71.

3. The bank, when it received the notes, became the agent and trustee of Rigdon, and subject to all the duties and responsibilities of a trustee, and bound to so conduct itself in regard to such collaterals as, by no fault of omission or commission, to prejudice the legal right of the debtor from whom they were received. *Robinson* v. *Clark,* 1 O. S. 1, 9; *Lambertson* v. *Windom,* 12 Minn. 252.

4. The bank had no right to compromise with the maker of the notes it held as collateral for any less than the sum due thereon, and by so doing it became liable to Rigdon for the full value of the notes, less the amount due from him. *Garlick* v. *James,* 12 Johns. 145; *Depuy* v. *Clark,* 12 Ind. 427; *Hawks* v. *Hinchcliffe,* 17 Barb. 492; 1 Schouler Per. Prop. 522; Story on Bail. sec. 821; Tyler Pledg. and Usury, 580.

Mr. JUSTICE BAKER* delivered the opinion of the Court:

It seems to be conceded a case like this has never before arisen. It may be well, therefore, to briefly state some of the principles which govern the relations of a pledgor and pledgee of personal property.

In *Cartelyon* v. *Lansing, Admr.* 2 Caines' Cases in Error, 200, is found an exhaustive examination of the subject of

---

* This cause was decided and the opinion prepared during the time Mr. JUSTICE BAKER was on the Bench.

pawns, by KENT, J., wherein he not only traces the history of the common law relating thereto, from the days of GLANVIL, but illustrates that law by apt references to and comparisons with the Roman law and the codes of Continental Europe. He therein notes the true line of distinction between a pledge or pawn of personalty and a mortgage, and says, in the case of the former the legal property does not pass as in the case of a mortgage, with a condition of defeasance, but that the general ownership remains with the pledgor, and only a special property passes to the pledgee.

The law is well settled, where there is no agreement otherwise, the pledgee in possession takes only a lien on the property as a security, and is bound to keep the pledge and not use it to its detriment, and to redeliver it on payment of the debt. His character is that of a trustee for the pledgor, to return the property if redeemed, and if not redeemed, then first to pay the debt, and second to pay over the surplus, and he can not so deal with the trust property as to destroy or even impair its value. See *Wheeler* v. *Newbould*, 16 N. Y. 393.

Where there is no special agreement, and when the subject of the pawn consists of ordinary goods and chattels, then they may be sold and the proceeds applied to the payment of the debt, and this sale may be either a judicial sale, or, in most cases, without judicial process, the legal requirements as to notice and the provisions of the law to secure fair dealing being duly regarded.

But there is a distinction between a pledge of ordinary chattels and a pledge of commercial paper. We said, in *Joliet Iron Co.* v. *Scioto Fire Brick Co.* 82 Ill. 549: "The pledge of commercial paper as collateral security for the payment of a debt does not, in the absence of a special power for that purpose, authorize the party to whom such paper is so pledged to sell the securities so pledged upon default of payment, either at public or private sale. He is bound to hold and collect the same as it becomes due, and apply the net proceeds to the payment of the debt so secured."

30—93 ILL.

The person holding commercial paper as collateral security for a debt due him has no right, unless perhaps in a very extreme case, to compromise with the parties to the security for a less sum than the sum due on the security, and if he does he will be compelled to account to the pledgor for the full value. Story on Bailments, § 321. And in *Garlick* v. *James*, 12 Johns. 145, although it was admitted the defendant acted in good faith, yet as he had compromised with the maker of the note, and had received a less sum than was due, it was held he did it at his peril, as he acted without authority, and he was held liable for the face value of the collateral note.

The principles thus stated apply to cases where there is no special contract between the parties authorizing a sale or other disposition of the property or securities pledged.

In this case there is an express stipulation in the contract signed by appellee, to this effect: "I hereby give said company authority to sell the same (*i. e.* the collateral securities) or any part thereof, on the maturity of this note, at public or private sale, without advertising the same, or demanding payment, or giving notice." The salient words of the contract, so far as regards this controversy, are, "*I give authority to sell at public or private sale.*" Is an arrangement made between the pledgee of past due negotiable paper which matured in his hands and is held as collateral security for a debt, and the maker of such paper, whereby he transfers to such maker that paper for less than its face, and for an amount precisely sufficient to pay the principal debt, a sale, within the meaning of the power conferred? This is the real question at issue.

There is no doubt the thing here done could not be lawfully done without the aid of the special power. But, as already remarked, there is no case found where the point at issue has been decided. There is no claim made the power given is against public policy, or is under the ban of any other legal objection.

The only case we find in which there was a special power

of like character with that here involved, is *Sparhawk* v. *Drexel*, 12 Bank Reg. 450, and the circumstances of that case and the wrongs there complained of were not the circumstances here found or the wrongs here alleged.   The court, in that case, laid down this rule of construction as applicable to such power:   " Such a contract, so far as it enables creditors to extinguish their debtor's right of redemption by a sale, must, like other contracts affecting equities of redemption, be construed benignantly for the debtor—as benignantly for him as may be consistent with the security of the creditors."   And further said:   " It is an authority to sell at private or public sale,   *   *   *   but creditors in whom such an authority is vested can not exercise it otherwise than under a trust for their debtor's benefit as well as their own.   They are not to frustrate any just expectation of a surplus, by forcing a sale for barely money enough to secure themselves."

The law will deal with the substance of this transaction, not its form.   Appellant held in its hands two notes of Miller, duly indorsed, one for $2000 and the other for $1000, both overdue, and both having fallen due while in its possession as security for the principal debt.   The presumption is Miller was solvent, and such presumption is not rebutted.   Thereupon, without having brought suit against, or even having ever demanded payment from Miller, the trust company informed him it regretted exceedingly to trouble him about the matter, but that Mr. Rigdon owed it a balance of some $1300, to pay which it was about to sell these two notes of his, and seventeen notes of W. P. Dickinson for $137.50 each, and concluded with the remark:   "I thought perhaps you would prefer to have the first chance to purchase."   This letter of May 3d must be understood, if not a direct proposition to surrender and transfer the collaterals on payment to the bank of the residue still due on the principal note, at all events as an invitation to a transaction of that character.   Six days after the date of that letter from the bank, it sold, surrendered and delivered to said Miller his two notes,

amounting to $3000, and the seventeen Dickinson notes, upon his paying $1342.72, the exact amount then due it upon the principal note of appellee.

An agreement between a creditor and his debtor, whereby the creditor agrees to take and receive something from his debtor in lieu and satisfaction of his claim, would be rather a compromise, or an accord and satisfaction, than, correctly speaking, a sale of the claim. The money paid is given for the purpose of quieting a demand against the debtor. An arrangement where the security is transferred for less than is due thereon to the party already bound by it, is called by Justice Story, in his work on Bailments, § 321, a compromise; and he seems to distinguish such case from the sale of a pledge. And such an arrangement is designated as a compromise in *Garlick* v. *James, supra,* and in *Depuy* v. *Clark,* 12 Ind. 428.

The intention of the parties to the contract is the real point of inquiry. When appellee authorized the trust company to sell the securities at public or private sale, what was understood and intended by the parties? Was not an ordinary sale and purchase in their minds?—a contract whereby the seller parted with property and title, and the buyer obtained property and the title thereto? Can we suppose they contemplated a transfer whereby the property would be destroyed and the title extinguished? If appellee had intended a transaction such as is here involved, would he not have used language such as is used in the books or by the courts, or other apt language to designate such transaction? Would he not have given authority to compromise or surrender the securities? Is it not a latitudinarian, if not a strained and forced construction, to call the transfer here a sale? In its ordinary sense and according to the common use of language, as also in the strict and proper acceptation of the word, a sale is not understood as designating a transfer such as this.

Again, the power under consideration is in derogation of common law duties, and wipes out wise and equitable safe-

guards interposed by that law for the protection of the pledgor, and relieves the pledgee from just duties imposed upon him; and which safeguards and duties are intended to prevent fraud and a breach of the trust imposed.

We feel constrained to hold the transfer here made to Miller, of these overdue securities, by which he was himself bound, was not a sale within the scope and intention of the power given to sell at public or private sale.

The findings of fact by the Appellate Court, "that appellant made reasonable efforts to sell said collaterals and failed to find a purchaser," and "that said sale and transfer to said Miller were so made without any collusion or actual fraud and for the best price that appellant could obtain for them, so far as is shown by the evidence," do not go to the gist of the injury complained of by appellee. The wrong was not in omitting to make reasonable efforts to sell the collaterals, nor in selling them collusively and fraudulently, nor yet in selling them for a less price than could have been obtained for them. It was for disposing of them in a manner not within the purview of the power delegated. The tort was the affirmative act of compromising with the maker of the securities.

Appellant might well have sold at private sale to Miller the Dickinson notes, but, as we have seen, the transfer was an entire transaction and included Miller's own notes which were due at the time, and the transaction was a tort and can not be apportioned. But, it seems, there was some testimony tending to show the insolvency of Dickinson, and it is evident from the verdict the jury assessed no damages on account of his notes.

Among the findings of fact by the Appellate Court was this in reference to the $2000 Miller note, " that after the making of the original loan of August, 1875, Miller informed appellant said collateral note had been given by him to appellee as accommodation paper and for no value, and that such information from said Miller was communicated to appellee by appellant, and appellee replied that he had given his note

therefor to Miller." The presumption of law is, the note was given for a good and valuable consideration. The note of Rigdon to Miller would be a sufficient consideration for the $2000 note, and the latter would be a binding and valid note against Miller. Besides, the whole question as to whether Miller "occupied the position of a mere surety," and whether "the notes of John Miller were given for a good and valuable consideration," were fairly submitted to the jury by the instructions of the court.

This brings us to the matter of the excluded testimony. That it was entirely competent to show the Miller notes were mere accommodation paper and given for no value, or that there was a legal defence to the notes or either of them, can not be successfully gainsaid.

The amount due on the notes was *prima facie* the measure of damages. *American Express Co.* v. *Parsons*, 44 Ill. 315.

On the trial appellant proposed to show that at all these times Rigdon was indebted to Miller, that Miller had been accommodating Rigdon for a long time, and that that indebtedness was up as high as $12,000 or $15,000 and remained so at the time when Miller died, sometime shortly after this transaction. He also proposed to show that Miller had, from time to time, given his paper as an accommodation to Rigdon; was in the habit of doing it. Objections to such proposed testimony were sustained and it was excluded, and exceptions were duly taken.

We think this testimony was properly excluded. A part of the offer was merely to prove an affirmative cause of action vested in Miller, or his legal representative, a right of action to which appellant was a stranger, and to set off the damages growing out of such cross-action against the damages here. This could not be done, as appellant had no such interest in the debts due from appellee to Miller as authorized him to set them off against this recovery. The other element of the offer was to prove a habit of Miller to give his paper to Rigdon as an accommodation. If we admit the

habit, it does not follow this particular paper was part of such accommodation paper, and there was no offer to make such identification. If the identity in fact existed, or could be proven, it must be presumed appellant's offer would not have been so restricted, but would have gone to that extent. With reference to the larger note there was evidence in the record it was for value, a promise for a promise ; and the $1000 note was one of a series of notes secured by a mortgage on real estate, and payment of which had been assumed by one Walker.

There was no offer to prove Miller was insolvent, or these particular notes were accommodation paper, or that Miller had a legal defence to them. To simply show he gave other paper to appellee which was for no value, or show he had other claims against appellee, would have been irrelevant to any issue in the case.

The further point is made that Miller, in purchasing his notes from appellant, did not pay their full face amount, and that such purchase would not deprive appellee of his right to recover the residue from Miller. If this be admitted, still a party having two remedies for an injury may elect which to pursue. Similar points were made, both in *Garlick* v. *James, supra,* and in *Depuy* v. *Clark, supra,* and in both cases decided adversely to appellant's claim here urged.

That which we have already said sufficiently disposes of the points made upon the rulings of the circuit court in regard to instructions. Those rulings were in substantial conformity with the views herein expressed.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*