# Union National Bank, David Kelly and John J. P. Odell v. Alfred Post, for the use of Francis A. Riddle.

1. APPELLATE COURTS—*Sufficiency of Evidence.*—The sufficiency of the evidence to support a verdict is a question to be considered exclusively by the Appellate Court.

2. PAYMENT—*By Taking a Note.*—The taking of one note for another is not a payment of the other, unless so treated and understood by the parties at the time.

3. PRACTICE—*Effect of Bringing Suit for the use of Another.*—The fact that a suit is brought for the use of another, in no wise affects the litigation, other than that the defendants having notice that the suit is brought for the use of another, can not make any settlement or compromise with the nominal plaintiff.

4. PROMISSORY NOTES—*Pledgee of, Bound to Account.*—A person with whom a note or anything else is pledged, is, in respect to the same, a trustee, bound to respond and account for the same as a trustee, and liable to be charged for neglect or misconduct like other trustees.

5. PLEDGEES—*Of Promissory Notes—Duty of.*—The pledgee of a promissory note is held to the exercise, in respect to the same, of such diligence as a prudent man exercises in respect to his own affairs.

6. SAME—*Responsibility of.*—When the pledgee of a promissory note, without authority, compromises with the maker thereof, he must respond to the pledgor and owner for the value of such note, and *prima facie* the face value is the true value, the burden of showing that the true value is less than the face value being cast upon the pledgee.

7. SAME—*Extent of Responsibility.*—The pledgee, in case of such compromise or settlement or a conversion of the pledged note to his own use, is responsible to the pledgor only for the true value, that is, for such damage as the pledgor has actually sustained.

8. AGENTS—*Declaration of, When Binding upon Principal.*—The admissions or declarations of an agent bind his principal only when made under the continuance of the agency in regard to a transaction then depending *et dum fervit opus.* It is because the statement or admission is an act, a part of the *res gestae*, that it is admissible at all. His admission of what in the past he did for his principal, is not admissible, because such admission is not a part of the thing done.

Trover, for the conversion of promissory notes. Appeal from the Superior Court of Cook County; the Hon. HENRY V. FREEMAN, Judge, presiding. Heard in this court at the March term, 1896. Reversed and remanded. Opinion filed June 1, 1896.

GREEN, ROBBINS & HONORE, attorneys for appellants.

Francis A. Riddle, *pro se;* S. P. Shope, of counsel.

Mr. Presiding Justice Gary delivered the opinion of the Court.

This case was here and decided at the October term, 1894. (55 Ill. App. 369.)

It was then appealed to the Supreme Court, and with the title reversed, is reported in 159 Ill. 421.

That court held that the judgment of this court meant that the Superior Court erred in not instructing the jury to find for the defendants, then and now, appellants.

The opinion of this court, directing that judgment, could not control or affect the construction to be put upon the judgment itself. Coalfield Coal Co. v. Peck, 98 Ill. 129.

The Supreme Court held that the Superior Court could not have erred in not instructing the jury to find for the appellants, if the plaintiff, appellee, offered " any competent evidence whatever, which, with all its legal inferences and intendments, tended to prove his right of recovery; " and whether there was any such evidence that court held, as it had often before held, was a question of law, "reviewable as such, in " that court.

But it did not hold, nor use a word to indicate that it intended to hold—contrary to what it has always held since Appellate Courts were organized—that the sufficiency of the evidence to support a verdict was a question to be considered by that court, or that in this case there was such sufficiency. On that question the case stands here now, as it did a year and a half ago, with the added weight against the appellee of the declaration by the Supreme Court " that the taking of one note for another is not a payment of the other, unless so treated and understood by the parties, at the time."

As was said here in the first opinion, " It now appears by the testimony of Odell and West both, the only two persons who could know about it, that nothing was said between them, as to one being in, or accepted as, payment of the other." And it was then held that the rights of the parties

depended upon the real facts, and not upon anything said, if not the real fact, by Odell to Riddle. Then, as it appears that in the exchange of notes, there was no understanding between the parties to the exchange, the law declares, as is said in the opinion of the Supreme Court, that the taking of one for the other was not a payment. Had it been the opinion of the Supreme Court that the mere taking of the Times-West note, for the West-Munroe note, was a payment of the latter, probably that court would not only have reversed the judgment of this court, but affirmed that of the Superior Court, which not being done, it may be that that question has become *res judicata.* Union Mut. Life Ins. Co. v. Kirchoff, 149 Ill. 536.

Had such been the opinion of the Supreme Court, all errors assigned by the appellants here, would have been without injury. Penn. Coal Co. v. Kelly, 156 Ill. 9.

It is true, that in the words referring to the appellee used in the opinion of the Supreme Court, is the sentence—p. 431— "If there is evidence tending to support that theory (theory of payment), we are unable to see upon what just or legal line of reasoning it can be held that he is not entitled to a recovery." Now it is to be supposed that the Supreme Court by that sentence meant to express an opinion as to the sufficiency of evidence, a question over which it has uniformly held, when directly presented, that it had no jurisdiction (Wallace v. Gould, 91 Ill. 15); and further, to overrule in this casual way, the many decisions of that court, made while it could review the facts, that a new trial should be granted upon a sufficient preponderance of evidence against the verdict. Some of such cases are collected in the opinion of the court, and more of them in the brief of counsel, in Thompson v. Fullenwider, 5 Ill. App. 551.

Wresting from the context on page 433 of the opinion of the Supreme Court the sentence commencing with "Certainly," and ending with "It seems to us not," the appellee presents them as an absolute declaration. They are only hypothetical, *i. e.,* if it be true that the one note was paid by the taking of the other.

On the questions treated in the former opinion of this court, the Supreme Court not only has not acted, but, in accordance with its previous decisions, could not act, and so the case is before us as it was at first. The views then expressed we still believe to be correct.

The action being for the use of Riddle, has no other effect than to protect him against anything that Post might do *pendente lite.* Tedrick v. Wells, 152 Ill. 214.

The judgment of the Superior Court is reversed.

Under the terms of the order of the Supreme Court, remanding the cause to this court, we can not now, if we would, enter a finding of facts as a ground for not remanding, and the cause is remanded to the Superior Court.

Reversed and remanded.

SHEPARD, J., takes no part in this case.

OPINION, UPON PETITION FOR REHEARING, BY MR. JUSTICE WATERMAN.

We think that the jury below found that the defendants, by what was done with the collateral note for $25,000, signed "James J. West, per F. S. W." converted such note to their own use, and that in consequence thereof the plaintiff, Post, the owner of said $25,000 note, is entitled in this action on the case, to recover whatever damage he suffered by reason of such conversion.

When the pledgee of a promissory note collects money on account of the same to an amount exceeding the debt for which it is pledged, the pledgor has an action for money had and received to recover such excess. If, instead of receiving money upon a note so pledged, the pledgee converts the same to his own use, the pledgor may maintain an action of trover or trespass on the case, and recover the damage which he has sustained, which is the value of the note so converted. Of course, in such action the amount of the debt for which the pledge was given would be deducted from the value of the note for which the pledgee is liable. Under the finding of the jury that the $25,000 note was by

the defendants converted to their own use, the principal question is, what, if anything, is the plaintiff, Post, entitled to recover—that is, what was the value of the $25,000 note when converted?

Counsel for appellee now contends that there can be recovered in this action any damage which Riddle, the party for whose use this suit is brought, may have sustained in consequence of such conversion, and he calls attention to the evidence that Riddle, being informed that said $25,000 note had been surrendered to West, thereupon advanced several thousand dollars to Post, believing that the $9,000 excess of the $25,000 note above the $16,000 indebtedness for which it was pledged, was held by the bank for the use of him, Riddle, such excess having been by Post assigned to Riddle.

We do not agree with counsel for appellee in such contention. In this action, the only damage that can be recovered is that sustained by Post in consequence of the conversion of the $25,000 note. The fact that this suit is brought for the use of Riddle, as well as the fact that Riddle obtained from Post an assignment of whatever balance might remain on this note after the $16,000 note was paid, adds nothing whatever to the amount which can be recovered thereunder, and in fact, in no way or wise affects this litigation, other than that the defendants, having notice of such assignment, and that this suit is brought for the use of Riddle, can not make any settlement or compromise with Post. Buckmaster v. Beames, 4 Gilm. 443; People v. Stacey, 6 Brad. 521; Lee v. Pennington, 7 Brad. 247; Northrop v. McGee, 20 Brad. 108; Chadsey v. Lewis, 1 Gilm. 153.

If Riddle was informed by Odell that the $25,000 had been paid, and if he had a right to rely upon such information, and in consequence thereof did advance to Post several thousand dollars, Riddle may be able to maintain an action against the defendants, or some of them, for such loss and damage as he, relying upon the statements of Odell in this regard, has sustained, irrespective of whether Post in this action is able to recover anything.

Counsel for appellee urge that the $25,000 note was, by what Odell did with the same, paid, satisfied and discharged, and that thereby the defendants became liable to Post for the face of said note, namely, $25,000.

It is not very essential by what words the transaction between Odell and West, by which the $25,000 note was surrendered to the latter, is characterized; whether it is termed a payment, a satisfaction, a discharge or a novation. The thing to be considered is, what was actually done. A person with whom a note or anything else is pledged, is, in respect to the same, a trustee, bound to respond and account for the same as a trustee, and liable to be charged for neglect or misconduct like any other trustee. The pledgee of a promissory note is held to the exercise, in respect to the same, of such diligence as a prudent man exercises in respect to his own affairs. Colebrooke on Collateral Securities, Secs. 114, 115.

So far as selling such note or compromising the indebtedness represented thereby with the maker is concerned, he has not the rights, and may not exercise the judgment, which a prudent man would in respect to his own affairs. When the pledgee of a promissory note, without authority, compromises with the maker thereof, he must respond to the pledgor and owner for the value of such note, and *prima facie* the face value is the true value, the burden of showing that the true value is less than the face value being thrown upon the pledgee. We regard the rule as well settled, that the pledgee in case of such compromise or settlement or a conversion of the pledged note to his own use, is responsible to the pledgor only for the true value — that is, for such damage as the pledgor has actually sustained. Jones on Pledges, Secs. 516, 518, 574; Girard Fire & Marine Ins. Co. v. Marr, 46 Penn. St. 504, 507; Hazzard v. Duke, 64 Ind. 220; Merchants and Planters Nat'l Bank v. Masonic Hall, 67 Ga. 271; Colebrooke on Collateral Securities, Sec. 131; Hancock v. Franklin Ins. Co., 114 Mass. 155, 157; Johnson v. Cumming, 109 Com. Law, 330; Jarvis v. Rogers, 15 Mass. 389; The Exeter Bank v. Gordon, 8 N. H. 66; Hunter v.

Moul, 13 Pa. St. 13, 15; Chinery v. Viall, 5 Exch. 287; Union Trust Co. v. Rigdon, 93 Ill. 458, p. 466; American Express Co. v. Parsons, 44 Ill. 315, 316; Zimpleman v. Veeder, 98 Ill. 613, 617; Sutherland on Dam., Vol. 2d, 190.

The verdict and judgment in this case is upon the theory that the note was actually worth its face — $25,000. Deducting the $16,000 to secure which the note was pledged, the plaintiff has recovered the full face value of the pledged note, with interest thereon, the judgment being for $12,500. A very great preponderance of the evidence—indeed, substantially all of the evidence which actually shows what value the note had, is to the effect that the note, when converted, was, and ever since has been, valueless.

The question is not in this regard what any one may have said the value of the note was, but what its real value was; market value is usually the best test of value; by this is meant what, in the proper market, with reasonable effort and time in which so to do, the note could have been sold for. The party for whose use this suit is brought, Riddle, testifies that the note was perfectly good for its face; that his knowledge of its value was gained from what was told him by Odell, Weigley and West, Weigley being the personal counsel of West, and that it was upon statements made by Odell to him, Riddle, that he subsequently agreed to sign the $16,000 note as Post's security. Such statement by Odell to Riddle might absolve him from his obligation to pay the $16,000 note, but is mere hearsay as to its value, and does not touch the real question, which is—what could have been obtained or collected upon the note? Sherlock v. C., B. & Q. Ry. Co., 130 Ill. 403; Sedgwick on Dam., Secs. 243, 244, 245.

The $25,000 note appears to have been surrendered to West about the middle of March, 1889.

The pledgee had no authority to sell the note; it was to mature September 17, 1889.

July 22, 1889, there was entered in the Circuit Court of Cook County at the suit of the Commercial National Bank, on a note made by James J. West, dated October 29, 1889,

judgment against him for $13,791.16, upon which, upon the 22d of July, 1887, levy was made upon the horses, carriages, household furniture and bric-a-brac contained in the house of James J. West, in Chicago. All of said property was taken from the sheriff July 30, 1889, upon four replevin writs, and the sheriff returned the execution, " No part satisfied, this 20th day of October, 1889."

On the 18th of September, 1889, in the suit of John Dolese et al. v. James J. West, judgment was entered in the Circuit Court of Cook County for $1,108.54, upon his note for that amount, upon which execution was issued, and on the 15th day of November, 1889, returned, no property found and no part satisfied.

On the 9th of September, 1889, before a justice of the peace, judgment was entered against James J. West for $97.20, upon which execution was issued and returned, " no property found and no part satisfied, this 21st day of December, 1889."

On the 19th of October, 1889, at the suit of Anson L. Story, plaintiff, judgment was entered against James J. West for $5,192.76, upon which execution was issued and returned no property found and no part satisfied, January 20, 1890.

On the 19th of October, 1889, in the Superior Court of Cook County, judgment was recovered by Anson L. Story et al. against James J. West for $5,177.91, upon which execution was issued, and returned no property found and no part satisfied.

In the United States Circuit Court for the Northern District of Illinois on the 27th day of November, 1889, judgment was entered against James J. West in the suit of John F. Irwin et al. for $64,000. Execution was issued and levied on the interest of West in 1,200 shares of the capital stock of the Chicago Times Company, and all other capital stock of said Chicago Times Company, upon which return was made that said interest in said capital stock had been sold for $275, and the execution satisfied as to such amount and unsatisfied as to the balance.

A member of the firm of Herman Schaffner & Co., bankers and brokers, buying and selling commercial paper, testified that they handled, on an average, from thirty to thirty-five millions a year; that in 1888 or 1889 they had some of the paper of Yaggy & West, of which firm James J. West was a member; that about 1888, or 1889, they had paper of James J. West offered to them in the course of business; that they never bought any of it; tried to sell it and could not; that this was in the spring of 1889, and it was offered to their firm frequently during that time; that it was the business of the firm of Herman Schaffner & Co. to go around to different banks, both in the city and out of town, to negotiate paper; that they were unable to sell the paper of James J. West that spring; that when West paper was presented they did not know sufficient about it to buy it; did not absolutely refuse, but said they would see about it; that they tried to see if they could negotiate it in the Chicago banks, and were unsuccessful; that the result was, they never took any West paper themselves, and were unable to place it; that in the spring of 1889 West paper had no market value in the city; that is, they could not dispose of it.

Frederick S. Eames, who was second vice-president of the Commercial National Bank in 1889, which had business relations with James J. West, testified: "We had occasion to investigate West's financial responsibility in March and April, 1889, and for a few months before that. Our bank at that time had a note of Mr. West's that had been made in 1887, for $25,000, on which $12,000 had been paid. In the spring of 1889 we undertook to collect the balance of it, but were unable to do so. We had a great many interviews with West, and tried to bring all the pressure we could to bear on him, but were unable to get any money. Later on we entered up a judgment upon the note, and tried to collect it by execution, but were unable to do that; by personal experience I should have thought it was very hard to dispose of West paper in March, 1889. I do not think it had any market value; we did our best to collect this paper, and were unable to do so. I do not think a note of James J.

West's for $25,000, due in September, 1889, could have been sold in March, 1889; in my opinion it did not have any market value in Chicago in March, 1889."

There is no evidence tending to show that between the middle of March, 1889, the time when the $25,000 note was converted, and the 22d day of July, 1889, or thereafter, the financial condition of said James J. West underwent any change other than the natural one of the maturing of obligations and the coming to a head of the situation which at the time of the conversion of the note was existing. It is true that West testifies that in the month of March, 1889, his condition was perfectly solid so far as he knew; that he did not have any paper for sale on the street; that he never was refused money by any bank he ever applied to; that at that time he does not think there was any doubt but that his note and the note of the Times Company were both worth their face. But we do not think such opinion can prevail against testimony as to the actual facts existing—that the note of James J. West had, in March, 1889, no market value whatever, and the fact that there is nothing to show that it has ever since had any actual value, or ever been collectible, or that anything ever has or could have been realized thereon. The question in this regard, therefore, appears to us to be whether the note of James J. West, which had neither market value, nor, so far as appears, any actual value, upon which nothing has ever been realized, nor is it shown that by any exertion anything could have been realized thereon, was, by the conversion thereof by the defendants in exchanging the same for another note of ten days later date, signed by the Chicago Times Company and by James J. West, converted into an instrument of value upon which a recovery can be had of $25,000. If the defendants, or any of them, have received anything on account of the $25,000 note by them converted, they ought to account for the same to the plaintiff, and if the plaintiff by reason of such conversion lost anything of value—was damnified, then to whatever amount he was so injured, the defendants should respond; but the evidence in this case seems to be clear that

said note had at the time of its conversion neither market nor actual value.

The judgment in this case can not, upon the record here presented, be sustained as to both Kelley and the Union National Bank.

Kelley either did or did not purchase the $16,000 note and become its owner. As to this, there is evidence tending to show that, notwithstanding the assignment of that note, the bank continued to be the real owner thereof. If so, then in all that Odell did he acted as the agent of the bank and not of Kelley. There is no evidence that Kelley ever instructed Odell to do anything whatever in respect to the collaterals. Kelley, while testifying that he did buy the $16,000 note, says: "At the time I gave this paper to Odell, I told him to bring suit, or do anything necessary to collect it. I did not know anything about what Odell did with these notes—that the $25,000 note was exchanged by Mr. Odell for the Chicago Times note for $25,750. I first heard of these exchanges of collateral notes about the time I had judgment entered upon that note, which was, as I recollect, about a year after I bought the note. I don't think I ever saw the note signed by the Chicago Times Company until yesterday; never had any of these collateral notes, except the original Munroe note, in my possession."

Mr. Odell testifies: "When I made that exchange, I was acting for Mr. Kelley, and not for the Union National Bank. I made these exchanges without any authority from Mr. Kelley. He never objected to it, and did not ratify it in any specific manner. I reported to him what I had done, and could not say he objected. I had no interest in the matter myself. Mr. Kelley did not know what was done until long afterward; when I reported to him he raised no objection to what was done; I should say, I reported to him the first exchange shortly after it was done; he said all right, or something of that kind."

This is not sufficient to fasten upon Mr. Kelley liability for the value of the collateral note exchanged by Mr. Odell for the Chicago Times and West collateral note, unless Mr.

Kelley is to be treated as the owner of the $16,000 note, and thereby the holder of the collateral, and entitled to give directions as to its disposition.

It is urged that Mr. Kelley ratified all that Odell had done. It is doubtful if the testimony of Odell as to what Kelley did when told of the exchange, can, in the face of the testimony of Mr. Kelley, be considered as establishing a ratification of the exchange; while, if Mr. Kelley was not the owner of the $16,000 note, then he was in no position to ratify anything that Odell had done in respect to the collateral.

As has before been said, the pledgee of a promissory note is held to the exercise of such diligence in respect thereto as a prudent man exercises in regard to his own affairs.

In Colebrooke on Collateral Securities, Sec. 15, it is said:

" The exchange or substitution of other securities for those originally delivered as collateral, has no effect upon the rights of the pledgee, as founded upon the original contract. The surrender of the securities originally deposited is a valuable consideration for the giving of the new securities, and the pledgee is as to the latter a holder for value, in the usual course of business. Such exchange and substitution is sometimes of the utmost benefit to the pledgor, and is supported as against creditors, for the reason that they are not harmed thereby."

In Girard Fire and Marine Ins. Co. v. Marr, 46 Pa. State 504, against the protest of the pledgor, there had been by the pledgee an exchange of certain collateral securities deposited to secure the pledgor's debt. Suit was brought against the pledgor upon the note so deposited. The court said:

" The court, we think, erred, therefore, in placing the defense on the simple ground that the plaintiffs exchanged the securities mentioned, without the consent of Thurlow, Hughes & Co. No doubt the pledgee of securities takes upon himself some increase of responsibility in making exchanges; the more his acts in the premises are complicated, the more numerous will be the points of attack that he may

have to guard, when the question of his care and diligence comes to be tried; but I take the law to be settled, that it is only the omission of these that will require the holder to account for collaterals when they have proved a worthless security. I think this rule the safest for all parties, and it should be adhered to unless altered by the terms of the pledge."

In the present case, the note deposited as collateral was as follows:

"$25,000.                    CHICAGO, September, 14, 1888.

One year after date I promise to pay to the order of James E. Munroe twenty-five thousand dollars, with interest at the rate of six per cent per annum, value received.

JAMES J. WEST,
per F. S. W."

While we have in this case the testimony of Mr. Munroe that Mr. Frank S. Weigley, by whom the name of James J. West was signed to this note, was authorized to so sign, yet it is apparent that the note upon its face was not merchantable. Any one to whom it was presented, for purchase, would see at once that the holder had upon himself the burden of establishing that "F. S. W." was authorized to sign the name of the maker, James J. West. Mr. Odell testifies that he recognized this, and it was one of the reasons which prompted him to make the exchange.

In the middle of March, 1889, Mr. Odell exchanged this note for the following:

"$25,750.                    CHICAGO, March 16, 1889.

September 24, 1889, after date we promise to pay to the order of James J. West, $25,750, payable at Times office, Chicago, value received, six per cent interest.

CHICAGO TIMES COMPANY."

(Indorsed on back:)

"James J. West," and again on back, "James J. West."

This note is shown by the evidence to have been, so far as the Chicago Times Company is concerned, an accommodation note, and was probably not binding upon it, but was binding upon James J. West, whose name appeared upon

the back thereof, and for whose accommodation it was made. It was made for the amount of the surrendered note, with interest up to March 16th, and was payable ten days later than the surrendered note, that note being due September 17, 1889, while the Times Company and West note was due September 27, 1889. Whether, under the circumstances, this exchange was such a one as a prudent man would have made, dealing with his own affairs, is a question of fact for the determination of the jury, as is also the question whether the plaintiff by reason of such exchange sustained any damage, which questions, upon the record here presented, it must be presumed the jury resolved against the defendants.

While the face value of the notes may have been the same, yet the difference in the times of their maturity is an essential element to be considered in determining whether the exchange was such as a prudent man would, in respect to his own affairs, have made.

If the exchange was not such a one as Odell had a right to make — that is, if it was not such an exercise of diligence as a prudent man uses in respect to his own affairs — then it is manifest that so soon as the exchange had taken place, whatever damage was thereby caused the plaintiff, had happened, and the bank could not escape liability by receiving back the note it had surrendered.

As the plaintiff's right of action, if any, was complete so soon as the exchange took place, and his damage is to be estimated by the condition of affairs then existing, any subsequent negotiations between the defendants or either of them and West, as to the payment of any or either of his notes held by the bank, as also any attempts made by the bank to collect or realize upon the notes of West, or either of them, which resulted in nothing, were not admissible upon the trial of this case, save for the purpose of showing what the value of the note of James J. West surrendered, was at the time of its exchange.

Neither such negotiations or attempts to collect could add to or take from the fact of the exchange and the consequent responsibility and liability of the bank therefor. As such

evidence did not tend to show that the note had any value at the time of its exchange, it should not have been admitted at the instance of the plaintiff and against the objection of the defendants.

At the instance of the plaintiff, the jury was instructed as follows:

"7. You are instructed that if you believe from the evidence that Mr. Odell had authority to do and say whatever he did do and say about the $16,000 note and the collateral note pledged with it, and that he did give that collateral note up to West, and took the Chicago Times Company note in payment of the collateral note, and that he did, on the 29th or 30th day of April, 1889, assure Mr. Riddle that said two notes were paid, and that he, Riddle was no longer liable in relation thereto, and if you further believe that said Riddle, acting on the faith of such assurances, did advance a considerable amount of money to Post, then in such case said Odell and those for whom he acted would be estopped from claiming contrary to such assurances."

Such instruction should not have been given. As before stated in this suit, it is immaterial what advances Riddle may have made to Post on the faith of assurances to him given by Odell. For such advances, as before stated, Riddle may have his separate action, but that can not be considered in this case. The instruction had a tendency to make the jury think that in this action a recovery could be had by Post for advances made to him by Riddle. The instruction would also be objectionable in any case against several defendants making separate defenses, because it put no limitation upon the source from which Odell had received authority.

It is urged that the court erred in refusing to give the following instruction:

"The jury are further instructed that the declarations or statements of an agent are evidence against his principal only when such statements and declarations are made by the agent while he is engaged in acting for his principal. The statements of an agent which are merely narrative of a

past transaction in which he was engaged for his principal, are not competent evidence against the principal, and any statements of Odell of this character in the evidence are not competent evidence for you to consider in reaching a verdict with respect to the defendant, Kelley, and in determining the liability of Kelley, you will exclude from your considerations any such statements of Odell."

As asked, we do not think it was error to refuse the instruction. The jury might, therefrom, well be in doubt as to the character of the statements of Odell which they were to exclude from their consideration. The admissions or declarations of an agent bind his principal only when made during the continuance of the agency in regard to a transaction then depending *et dum fervit opus.* It is because the statement or admission is an act, a part of the *res gestæ*, that it is admissible at all. His admission of what at the past time he did for his principal, is not admissible, because such admission is not a part of the thing done. 1 Greenleaf on Evidence, Sec. 113.

The petition for a rehearing is denied.