### SMITH v. LEE et al. (DILLON, Intervener).

(Circuit Court, N. D. Iowa, E. D. January 13, 1898.)

**1. PLEDGE—SALE BY PLEDGEE.**

The owner of stock, who has pledged the same under an agreement giving pledgees the right to sell at public or private sale, without advertisement or notice, at their discretion, cannot compel an accounting by the pledgees and purchasers of a portion of the stock, or the establishment of a trust with respect to the same, because such stock was sold for less than its value, when, a month prior to the sale complained of, other shares of the pledged stock were sold at the same price, with the consent of the owner, and at the time of the latter sale neither the pledgees nor the purchaser had knowledge of a transaction calculated to enhance its value, and the sale was conducted by the pledgees in good faith, and with regard to the interests of the owner.

**2. SAME—FRAUD.**

A pledgor of stock, who specially consented to a sale of a portion of the same to a particular person at a price proposed by him, will not be allowed in equity to assert that his consent extended only to sales made to that person, with whom he claims to have been an interested party, and with whom he shared the profits at the expense of his creditors.

**3. PLEDGE—SUBSTITUTION OF COLLATERAL.**

A person who substituted stock owned by him for that pledged by another cannot claim that he did not know that, under the terms of the pledge as originally made, the stock was subject to public or private sale, without advertisement or notice, when the substitution was under such circumstances as to lead the pledgee to believe that there had been an exchange between the parties, and the substituted shares were the property of the pledgor, to be dealt with as those originally pledged.

Wm. Graham, for complainant.

Alphonse Matthews, for intervener.

Henderson, Hurd, Lenehan & Kiesel and Longueville & McCarthy, for defendants.

SHIRAS, District Judge. From the evidence in this case it appears that prior to July 1, 1891, there was organized a corporation at

Dubuque, Iowa, known as the Dubuque Specialty Machine Works, and that 350 shares of the capital stock therein was issued to A. Ferris Smith, the present complainant. This stock on July 20, 1891, was pledged by Smith to D. M. Hillis, of Chicago, to secure pre-existing debts for $15,000, due to Hillis and other parties represented by him, and subsequently, with the consent of Smith, 100 shares of the stock was transferred through L. R. Giddings to the Dime Savings Bank of Chicago as collateral to a note for the sum of $5,628.33, dated September 9, 1892, payable on demand to the order of L. R. Giddings, and executed by Smith. The remaining shares of stock were left in the hands of Hillis as security for a debt which was several times extended by new notes, the last ones being dated January 10, 1894, and payable 30 days after date. These notes to Hillis and Giddings contained a description of the shares of stock pledged as collateral with the statement, "which I hereby give the said legal holder of said note, his agent or assigns, authority to sell, or any part thereof, on the maturity of this note, or at any time thereafter or before, in the event of said securities depreciating in value in the opinion of said legal holder of said note, at public or private sale, at the discretion of said legal holder of said note, or his assignee, without advertising the same, or demanding payment, or giving me any notice, and to apply so much of the proceeds thereof to the payment of this note as may be necessary to pay the same." These notes were not paid by Smith, and, so far as the evidence discloses, remain yet unpaid, except by the crediting thereon of moneys received from sales of the collaterals deposited for the security thereof. At a date subsequent to the original pledging of the stock as collateral, Smith wished to raise money to aid him in his efforts to sell the patents and property of the Dubuque Specialty Machine Works, and to that end arranged with the intervener, Timothy Dillon, who was a large stockholder in the company, that 100 shares of the stock owned by Dillon should be substituted for a like number of Smith's shares pledged to Hillis, and the latter should be used in raising money needed by Smith. This exchange was made with Hillis, the reason assigned for the exchange being that it was proposed to raise the money by a sale of the 100 shares of stock to parties living in Dubuque, who would not be likely to buy the same if it appeared that the stock offered for sale belonged to Dillon, who was a heavy shareholder, and at the time the managing director, of the company. By December, 1892, the conclusion was reached that the Dubuque Company could not carry on the manufacture and sale of the mortising machines to good advantage, these machines being made under certain patents owned by the complainant and the company, and a written agreement was entered into between the complainant and the company under date of December 29, 1892, whereby the company agreed to sell to complainant, or to any one to whom he might direct, the letters patent owned by the company, and all machinery, tools, drawings, and patterns belonging to the company, for the sum of $200,000, the sale to be completed within six months. It is shown by the evidence that this contract was not deemed to be a sale on part of the company to complainant, but it was executed as evidence that complainant had

the right to make sale of the property of the company named in the agreement upon the terms therein stated. Armed with this authority, Smith went to New York and Connecticut, and endeavored to make a sale of the property to third parties, and continued these efforts without success up to the spring of 1895. During this period it seems that disagreements respecting the company affairs had arisen between the directors, and it seemed important to the disagreeing parties to obtain control of a majority of the capital stock of the company with a view to the annual election of directors, which would take place in June, 1895. In April of that year the intervener, Dillon, went to Chicago, and entered into negotiations with Hillis for the purchase of the stock, or a part of it, held by Hillis as collateral to Smith's note. His final offer was to pay $25 per share, or 25 cents on the dollar. Thereupon Hillis telegraphed to Smith, in New York City, as follows: "Dillon here. Offers twenty-five dollars per share for stock. Shall I sell? Answer,"—and received a reply in the following terms: "Proposition from Dillon satisfactory to me." Hillis thereupon sold to Dillon 110 shares of the stock for $25 per share, and credited the proceeds on Smith's indebtedness, and he also informed Dillon that he could sell him the balance of the pledged stock at the same figures, and Dillon agreed to let him know whether he would take it immediately after his return to Dubuque. On April 23d Dillon wrote to Hillis that the company might have to look up new quarters for their business, which would entail an assessment on the stock; that the company were in receipt of a letter from Smith, requesting an extension of his contract authorizing him to sell the patents and other property until July 1st, and that for the present he would drop the negotiations for a purchase of the stock held by Hillis. Under date of May 2, 1895, Dillon again wrote to Hillis, stating:

"With the stock now in my possession, I have been able to form a combination that gives us full control, and will protect us from further assessments, except where absolutely necessary to run the business, and leaves us in position to close out should we find it for the best interests of the stockholders to do so. I believe I could sell your stock, but it would have to be at a less price than we talked of. If you want to sell, and make the price right, I think I could dispose of it for you. I will do nothing in the matter until I hear from you, and know that I can deliver the stock, should I be able to make the sale."

On or about May 20, 1895, the defendant Lee went to Chicago for the purpose of buying the stock pledged by Smith. He testifies that he had learned that Dillon was endeavoring to obtain control of sufficient of the stock to bring about a change in the directory of the company, and, after a discussion of the situation with Dr. Staples, the then president of the company, he went to Chicago for the purpose named. He called upon Hillis and W. R. Plumb, an attorney, who represented and acted for the Dime Savings Bank, and, after some discussion, agreements were entered into on the 21st of May, 1895, whereby the parties named agreed to sell the pledged stock to Lee for $25 per share, and to deliver the same upon the payment within 10 days by Lee of the price agreed upon. Thereupon Lee returned to Dubuque, and within the 10 days succeeded in making

sales of the same to Dr. Staples and the other named defendants, retaining 50 shares for himself; and, the purchase price having been remitted, the 250 shares of stock were transferred to him, and subsequently new certificates were issued and delivered to the several parties who had become interested in the purchase. It also appears that during the month of May, 1895, negotiations were pending between the complainant, Smith, and F. G. Platt with regard to a purchase of the patents and property of the Dubuque Specialty Machine Works, which resulted in the making of a written agreement, dated May 15, 1895, in which it was recited that:

"Whereas, it is proposed to organize and establish in New Britain, Conn., a corporation to be known as the New Britain Machine Co., with a capital stock of $300,000, for the purpose of purchasing the patents, machinery, stock, fixtures, etc., of the J. P. Case Engine Co. and the Dubuque Specialty Machine Co., and to manufacture the Case engine, and the chain mortising machine: Now, therefore, it is agreed by A. Ferris Smith, of Chicago, that he will deliver and assign to said Co., to be organized, all of the patents now granted or pending in the U. S. and Canada referring to chain mortising machines and which are now owned by the Dubuque Specialty Machine Co., upon receipt of $100,000 of the paid-up stock at par of the New Britain Machine Co., to be organized, and $125,000 in cash. * * * Said payment of stock and cash to be made at as early a date as possible, but not later than June 15th, 1895."

From the evidence it appears that the final completion of this proposed arrangement was dependent upon the success of Platt in securing sufficient subscribers to the capital stock of the proposed company at New Britain, and upon the further question whether, upon examination of the property and patents of the Dubuque Company, they were found to be as represented. It appears that after some days' delay Platt obtained sufficient stock subscriptions to organize the New Britain Company, and a committee was appointed to visit Dubuque, to examine the patents and property of the Dubuque Company. Upon visiting Dubuque, and examining the property, the committee, under date of June 22d, made a written proposition, addressed to Smith, to purchase the property and patents of the Dubuque Company for $100,000, to be paid in cash, and $75,000 in stock of the New Britain Company, to be organized with a capital stock of $250,-000. This proposition was accepted, and was finally completed by a transfer of the property and patents of the Dubuque Company to the New Britain Company, and the payment of the $100,000 cash to the Dubuque Company, the stock received thereon going to the complainant, Smith. After the receipt of the cash paid on this purchase, dividends on the capital stock of the Dubuque Company were paid, amounting in the aggregate to the sum of $51.50 on each share, which practically closed up the business of the company. When in Dubuque, in June, with the committee representing the New Britain parties, the complainant notified the defendants that he claimed that the sale of the stock by Hillis and the Dime Savings Bank to them was without authority, and, failing to get a settlement, on September 12, 1896, he brought this suit for an accounting, basing his right thereto on two general grounds: First, that Hillis and the Dime Savings Bank had no legal right to sell the stock pledged to them in the

manner in which the sales were made; and, second, that in making the purchase Lee acted for the other defendants, who had all combined to buy the stock at much less than its real value, knowing that Smith had made a contract with F. G. Platt, trustee, for the sale of the property of the Dubuque Company, which, if consummated, would give a large value to the stock, and that Lee concealed or misrepresented the facts to Hillis and Plumb, acting for the Dime Savings Bank, and was thereby enabled to secure a transfer of the stock for $25 per share, when it was in fact worth over $50 per share; and therefore, in equity, the defendants can be decreed to hold the stock in trust for complainant.

As already stated, the complainant, Smith, in the notes evidencing the debts for which the stock was pledged as security, had agreed that the holders of the notes might sell the stock at public or private sale, without advertising the same, or without demanding payment, or giving notice to Smith; and the validity of such contracts is recognized in Illinois, in which state these contracts were made, and were to be performed. Cushman v. Hayes, 46 Ill. 145; Trust Co. v. Rigdon, 93 Ill. 458; Zimpleman v. Veeder, 98 Ill. 613. These cases, however, also recognize the rule that, where a party undertakes to exercise a right to sell property pledged under contracts of the character of those contained in the notes executed by the complainant, he must have due regard to the rights and interests of the pledgor, and must not knowingly or carelessly make a sale which will result in injury to the interests of the pledgor; and the question is whether the facts show, as is the contention of the complainant, that in making the sales of the stock due regard was not paid to the interests of the pledgor in such sense that a court of equity would be justified in holding that the sales must be set aside, because in making them Hillis and Plumb failed to exercise due care, and thereby sacrificed the stock to the injury of complainant. The evidence shows that the debts secured by the stock were long past due. The holders of the securities had been lenient towards Smith, and had given him full opportunity to secure an advantageous disposition of the stock. When Dillon visited Chicago, in April, for the purpose of buying the stock, Hillis telegraphed to Smith in New York, stating that Dillon offered $25 per share for the stock, and Smith replied that Dillon's offer was satisfactory. If Hillis had then sold the entire amount of the stock at those figures, no complaint could have been made on part of Smith. Dillon actually bought 110 shares, but left the trade open for the balance, but finally wrote Hillis that he personally did not want the remainder of the stock, but that he might sell it for him at a reduced figure. In the following month the sales were made to Lee at the same figures which Smith had said were satisfactory when offered by Dillon, and there is nothing in the evidence which shows that Hillis or Plumb had learned any facts showing a change in the value of the stock or in the situation which should have deterred them from accepting the offer of $25 per share. Smith knew that Hillis was endeavoring to sell the stock, and he knew that he himself had said, in response to the telegram from Hillis, that Dillon's offer of $25 per share was satisfactory; and it would seem, if there was negligence to be charged

84 F.—36

to any one in this particular, it lies upon Smith, for, if his present theory be correct, he knew in the early days of May that there was a strong possibility of making a sale of the property of the Dubuque Company at a figure which would increase the value of the stock, and yet he did not write Hillis on the subject, but allowed him to remain under the belief that a sale at $25 per share would be satisfactory to him.     It is sought to explain this by the claim that Smith's answer to Hillis' telegram meant that a sale at $25 per share to Dillon would be satisfactory, not because that was a fair value of the stock, but because Dillon and he were operating together, and that a sale to Dillon would be, in effect, a sale for his (Smith's) benefit, because he and Dillon would share in the benefit of the purchase.     In other words, the theory seems to be that Hillis and the savings bank could lawfully make a sale of the stock to Dillon at $25 per share, but could not lawfully make a sale to Lee at the same figures, because, in case of the sale to Dillon, Smith was interested, and would share in the profits to be realized on the purchase, which fact, however, was not made known to Hillis and the savings bank.     The fact that Smith was willing to combine with Dillon in making the purchase from Hillis and the bank so that he might profit at the expense of his creditors, is certainly no good reason why a court of equity should interpose for his further benefit to set aside sales made of the stock at the figures which he had said were satisfactory to him.

It must therefore be held that the evidence fails to show any sufficient reason for holding the sales of stock to Lee to be invalid by reason of the want of proper care on part of Hillis and the Dime Savings Bank in protecting the interests of Smith as pledgor, and the next question is whether such sales can be invalidated on account of the action of Lee in making the purchase.     In substance, the bill charges that the defendants, having knowledge that Smith had closed a contract for the sale of the property of the Dubuque Company, which, when carried out, would greatly increase the value of the stock, combined together to purchase complainant's stock at a low figure, so as to deprive him of the increased value, and secure the benefit for themselves; and to that end Lee went to Chicago, and induced Hillis to sell the stock at $25 per share, by representing that the stock was of little value, was liable to an assessment which Smith would be unable to pay, and that the defendants were looking after the interests of Smith, and would protect him in case the stock was sold.     In the evidence the only point relied upon to impugn the good faith of defendants in making the purchase is the alleged fact that when Lee went to Chicago he had knowledge of the contract of sale between Platt and Smith, because Smith had written a letter setting forth the matter to the company or its secretary, which was received in Dubuque, and its contents made known just before Lee went to Chicago; and the contention of complainant is that Lee and his associates learned through this letter that terms of sale had been reached which would greatly enhance the value of the stock, and that, for the purpose of reaping the benefit thereof, Lee went to Chicago, and, concealing the facts, succeeded in buying the pledged stock at far less than its real value.     To sustain the contention of complainant, the burden is on him of proving that

the letter was written and sent to Dubuque, that its contents were such to show an agreement for a sale that would enhance the value of the stock, and that Lee knew the facts thus stated before he made the purchase of the stock. The letter is not produced in evidence. Smith kept no copy of it, and does not attempt to give its contents with any accuracy. Two or three of the witnesses for complainant at Dubuque testify with more or less directness to their recollections that such a letter was received, but none can give the date, nor do they agree as to its contents. In view of the fact that many letters had been received from Smith during the two years and a half in which he had been attempting to sell the property, and several had been received during April and May, 1895, it is entirely possible that all these witnesses have in mind the contents of letters written by Smith, but are confused as to the exact time they were written. Smith's testimony is that about the 7th day of May he and Platt had gotten practically to an agreement, which was, in substance, put in writing in the agreement dated May 15, 1895; that on the evening of the day, when Platt made the proposition, which he (Smith) said he wished to sleep over, he wrote to the Dubuque Company, stating that an arrangement had been reached for a sale of the property, and the contention of complainant is that the knowledge derived from the contents of this letter is what renders the purchase of the stock by Lee a fraud upon the rights of Smith. As already stated, neither the letter nor a copy thereof are produced, and no witness claims to be able to give its contents with any accuracy. Lee testifies that he never saw or heard of any such letter, and that when he went to Chicago, and purchased the stock in question, he had no knowledge of any contract of sale on part of Smith. Some light is thrown upon this point by the letter of May 16, 1895, written by Smith, at New Britain, Conn., to the Dubuque Company, which is as follows:

'Gentlemen: I have not been in New York for about a week, so have received no mail, if you have written. I rec'd the tools all O. K. De Witt forwarded them to me. I shall have something to say to you soon, but it is still uphill work to do much, and the load seems heavy to pull. I get everything to looking good, and then something turns up to upset the work of weeks. * * * I shall stick right to this now until settled one way or the other. Can't afford to give it any more time after the expiration of my present contract. I am writing a little blue, and yet I expect to make the deal, as I say I am bound to win if I don't get a dollar for myself out of it.''

It seems hardly possible that, if Smith had written a letter about a week or so before the date of this one, in which he had stated that he had a sale practically completed, as is now claimed, he should have written one of the tenor of that just quoted, and not have made any reference to his former letter, or given any explanation why the former contract had not been completed.

Taking the entire evidence into account, it must be held that complainant has failed to prove that when Lee purchased the stock in Chicago he knew that a sale of the property of the Dubuque Company had so far progressed that he would be chargeable with fraud in making the purchase for the price offered by him, and it follows, therefore, that the complainant cannot rightfully call the defendants

to account for the stock which was thus bought from parties having the right to sell it under the authority given them by the complainant. The utmost claim that could be made on behalf of the complainant is that the equities and rights of the parties should be considered on the assumption that Hillis, the Savings Bank, and Lee, acting for the other defendants, knew the real facts of the situation when the stock was sold on the 21st of May, 1895. Experience had then shown that the company could not earn a profit by carrying on the business at Dubuque, and the hope of realizing anything of moment for the stockholders was dependent on selling out the patents and property to other parties. Smith had been engaged in the effort to make a sale for over two years, without success. He had held out promises of success, but had been so far disappointed in being able to accomplish anything, and he had obtained about all the money that the Dubuque friends of the enterprise were able or willing to advance him. In May, 1895, he was endeavoring to bring about a deal with F. G. Platt, but with regard to which he felt no more confidence than that shown in the letter of May 16th, already quoted from. He had succeeded in getting a preliminary agreement with Platt, but whether it would be carried out depended on many contingencies, the first one being whether Platt would succeed in getting stock enough subscribed to proceed with the organization of the company, and then whether, upon examination of the patents and other property of the Dubuque Company, the other parties would conclude to make the purchase. This was the situation when Hillis and Plumb sold the stock to Lee in Chicago. The utmost that can be said is that there were chances that the sale might go through, but fully as many that it would not. If it did, the stock would be worth 50 cents on the dollar; if it did not, the stock would be practically worthless. It could not be expected of Hillis and the bank that they would run so many chances of loss for the possible gain. They were justified for their own protection in taking advantage of the offers made them. If they had refused the price offered by Lee, and the deal with Platt had not been completed, they would not only have lost the sums realized, but they would have been liable to be called to account by Smith for their failure to make the sale. His claim would have been that they knew that there was no hope of realizing from the stock except by sale of it, and that its value was mainly speculative; that, in response to inquiry, he had said that a sale at $25 per share was satisfactory to him; that they had the opportunity to sell at that figure, and that they could not refuse that sum, holding for an increased value, and compel him to run the risk of a speculative advance in price or a total loss in value. Certainly, under all these circumstances, it must be said that Hillis and Plumb, acting for the savings bank, acted prudently in making the sale at $25 per share, in view of all the uncertainties and contingencies that then inhered in the situation; and if, with knowledge of the actual situation, it was prudent for them to sell, having regard for their own interests as well as those of the pledgor, it cannot be held that it was a fraud on part of the defendants to make the purchase, they having the same knowledge possessed by Hillis and Plumb, but no more. It must therefore be held that the complainant

has failed to make out a case against the defendants upon any of the grounds charged in the bill.

The intervener bases his right to a decree upon the theory that the 100 shares of stock which were substituted for an equal number owned by Smith, and originally pledged to Hillis, are still his property, and that he did not know the terms of the pledge, and never consented that the stock should be sold at private sale without notice. The evidence shows that the arrangement for the exchange of stock was made between Smith and Dillon, and under such circumstances that Hillis had the right to assume that the exchanged stock would become and remain the property of Smith, to be dealt with by Hillis the same as the shares originally pledged. The facts do not make it a case wherein Dillon pledged his property to secure a debt of Smith to Hillis, but simply a case wherein Smith's stock passed to Dillon and Dillon's to Smith, each becoming the owner of the stock exchanged; and therefore Dillon is in no position to claim an accounting from Hillis or from the defendants for the sale of the stock in question.

The bill of complainant will therefore be dismissed, at his costs, and that of the intervener at his costs.